# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

JULIE MCKEY,

        Plaintiff,

v.

U.S. BANK NAT'L ASSOC.,

        Defendant.

Case No. 17-CV-5058 (NEB/DTS)

ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Julie McKey brought this action for age discrimination and retaliation against her former employer, defendant U.S. Bank National Association ("U.S. Bank"). U.S. Bank moves for summary judgment on both claims. For the reasons that follow, U.S. Bank's motion is granted.

## BACKGROUND

### I. McKey's Employment with U.S. Bank

U.S. Bank is a national bank with its offices in Minneapolis, Minnesota. [*See* ECF No. 1 "Compl." ¶ 3.] McKey started working for U.S. Bank in 1975. [ECF No. 77 "Rochel Decl." ¶ 4 ("McKey Dep.") 24:7-8.][1] In 2006, McKey transferred into the Global Corporate

---

[1] The Declaration of Brian T. Rochel includes deposition transcripts for Julie McKey, Yvonne Mehsikomer ("Mehsikomer Dep."), Keith Frolicher ("Frolicher Dep."), Alice Owens (individual "Owens Dep." and as a 30(b)(6) deponent "Owens Dep. 30(b)(6)"), Kerri (Kristich) Guse (individual "Guse Dep." and as a 30(b)(6) deponent "Guse Dep. 30(b)(6)"), Nathan Caswell ("Caswell Dep."), and Scott Joers ("Joers Dep."). In citations throughout this opinion, the Court uses the full deposition transcripts that are attached to the Rochel Declaration.

Actions department as a Securities Specialist, the position she held until her termination in September 2016. (McKey Dep. 26:9-19, 28:4-18; 40:4-8.) McKey's job duties, which she was typically expected to complete in a 40-hour workweek, included managing clients' financial portfolios, processing trades and transactions, meeting deadlines, and working with multiple computer systems. (McKey Dep. 34:11-36:12, 38:8-10; Mehsikomer Dep. 20:9-25.) McKey's team consisted of six to eight members who worked together to process transactions such as "stock options, dividends, stock splits, [and] different sorts of events that foreign companies could invest in." (Mehsikomer Dep. 22:13-23:15; *see also* Caswell Dep. 11:2-9, 20-12:10.)

In 2011, McKey began reporting to Yvonne Mehsikomer. (Mehsikomer Dep. 13:6-9.) Mehsikomer reported to Senior Trust Technology and Support Services Manager Keith Frohlicher, who reported to U.S. Bank Operations Manager Alice Owens, who reported to Senior Vice President of Global Services Scott Joers. (Mehsikomer Dep. 16:22-17:19; Rochel Decl. Ex. B.)

II.     **McKey's Performance Reviews**

Generally, McKey was a solid employee. (Mehsikomer Dep. 34:11-25.) McKey's performance was generally unremarkable until 2015, and her annual performance reviews contain both positive comments and constructive feedback. (McKey Dep. 105:6-14; Mehsikomer Dep. 174:10-20; Owens Dep. 12:8-13:3.)

U.S. Bank uses a 1-out-of-5 rating system in its employee performance reviews: 1 is the best ("exceptional"), and 5 is the worst ("not effective"). [*See* ECF No. 52 "Emmons Decl." Exs. 11-13, 15.] McKey's 2011 performance review, completed by Mehsikomer, shows an overall 3-out-of-5 performance rating. It states, "Julie needs to learn how to work along side [sic] her peers." (Emmons Decl. Ex. 11 at 2; McKey Dep. 45:15-49:8.) McKey's 2012 performance review again shows an overall 3-out-of-5 performance rating and notes, "Julie needs to work on managing her time better." (Emmons Decl. Ex. 12 at 2; McKey Dep. 54:8-57:22.)[2] Her 2014 review contains the same rating, this time noting that "Julie was having a hard time processing her events within an 8 hour day and was working a lot of overtime and needing to ask coworkers for help," and that "Julie needs to continue to work on processing all her events in an 8-hour work day, and also without help." (Emmons Decl. Ex. 13 at 2; McKey Dep. 80:10-82:21.) Similarly, McKey's 2015 performance review shows an overall "solid performance" rating, but Mehsikomer continued to note the same issues and gave McKey a "needs improvement" rating on the "Establish Trust" category of her review. (Emmons Decl. Ex. 15 at 4.) McKey's 2015 performance review also notes that McKey needs "to continue working on staying on top of her desk and completing tasks assigned to her in an 8-hour day. She also needs to work on reporting issues, not assigned to her, to her manager right away rather than do them herself and get behind on her own desk." (*Id.* at 5.)

---

[2] The record does not contain a 2013 review.

The 2015 review also states that McKey caused on error on an event "by not properly researching her events on XSP, or asking her manager for assistance." (*Id.* at 3.) The 2015 review concludes, "Julie had a year of challenges and struggles ... Julie needs to learn to utilize her time more efficiently and ensure her own desk is complete before helping others. My challenge for Julie is to work on being able to complete her desk in an 8-hour day." (*Id.* at 6.) All in all, McKey's reviews consistently show that she struggled to get her work done on time and correctly. (*See* Emmons Decl. Exs. 11-13, 15.)

## III.    XSP/SWIFT System

During McKey's employment with U.S. Bank, the bank used the XSP computer program to make client elections. (McKey Dep. 35:23-36:7, 49:12-50:5; Mehsikomer Dep. 25:22-23.) McKey's job duties included using XSP. (McKey Dep. 35:23-36:7, 49:12-50:5; *see also* Mehsikomer Dep. 25:22-23.) In 2015, U.S. Bank introduced an advancement to XSP called SWIFT. (Mehsikomer Dep. 24:7-25:22, 38:18-39:17; Owens Dep. 45:1-9.) SWIFT was new to the entire team. (Mehsikomer Dep. 37:21-38:4.) Employees attended various trainings on SWIFT, both in group settings and individually via one-on-one training. (Mehsikomer Dep. 37:21-38:12; McKey Dep. 65:5-22.) McKey wanted additional training beyond what was offered to everyone else in the department, and she wanted someone to sit with her at her desk every day to help her do her job. (McKey Dep. 70:6-71:9, 72:12-74:9.) U.S. Bank provided additional training to McKey when she requested it. (Mehsikomer Dep. 73:25-74:1.)

## IV.    McKey's Work Performance, Allegations of Discrimination, and the "Iberdrola Error"

As is evident from the performance reviews, McKey's "performance started to go down in the fall of 2015." (Mehsikomer Dep. 174:19-20.) Mehsikomer described McKey as "start[ing] to show that she was losing the ability to process her desk." (*Id.* at 174:13-20.) McKey continued to make errors when using the SWIFT program. (McKey Dep. 59:6-60:20.) In July 2015, Mehsikomer started a "significant event form" to reflect McKey's performance issues. (Mehsikomer Dep. 168:3-169:2; Emmons Decl. Ex. 14.) The significant event form describes instances of McKey failing to complete her assigned duties or needing extra time to complete her work. (McKey Dep. 50:6-51:9, 84:2-86:20; Mehsikomer Dep. 44:17-45:9; Emmons Decl. Exs. 11-13.) McKey also made mistakes posting client elections. (Emmons Decl. Ex. 14.) Mehsikomer and her manager, Frohlicher, met with McKey at various times during the fall of 2015 to address these issues. (Emmons Decl. Ex. 14; Mehsikomer Dep. 44:17-45:9; Frohlicher Dep. 11:5-11, 13:20-23.)

On April 22, 2016, Mehsikomer met with McKey to deliver a 60-day Action Plan, also known as a performance improvement plan ("PIP"). (Emmons Decl. Ex. 16.) The Action Plan detailed McKey's performance issues and stated that McKey had 60 days to improve her performance with U.S. Bank. (*Id.*) Under the Action Plan, U.S. Bank reserved the right to take additional action with respect to her employment, including termination, prior to or at any time after the completion of the plan. (*Id.*) In the meeting with Mehsikomer, McKey stated that she believed several of the assertions in the Action Plan

were inaccurate, and expressed her intent to contact human resources. (Mehsikomer Dep. 56:21-57:10; McKey Dep. 150:16-151:6.) After meeting with McKey, Mehsikomer emailed Senior Human Resources Business Partner Kerri Guse ("Guse"), explaining that McKey would be contacting her to report concerns. (Rochel Decl. Ex. G.)

McKey was true to her intent, emailing Guse soon after: "I am concerned that my manager [Mehsikomer] is attempting to have me fired due to my age. I am planning to retire at 65 years of age. I am 64 now. I would like a chance to discuss this with you please as soon as possible." (Emmons Decl. Ex. 17.) Guse called McKey to address her concerns. (McKey Dep. 186:1-188:6; Guse Dep. 32:8-35:23; Emmons Decl. Ex. 18.)

Meanwhile, McKey continued to make errors while on the Action Plan. (McKey Dep. 195:17-199:25.) For example, on May 11, 2016, an employee discovered that McKey had not followed procedure for making a client election. (Emmons Decl. Ex. 14.) On May 19, 2016, another employee notified Mehsikomer that McKey asked her team members questions several times a day about how to complete her job duties. (*Id.*; *see also* Emmons Decl. Ex. 19.) On May 23, 2016, McKey failed to properly make an election for a customer. (Emmons Decl. Ex. 20; McKey 195:13-23.) Around this same time, she also made another mistake when posting a different client election, and her co-worker had to correct the error. (Emmons Decl. Ex. 21; McKey Dep. 196:21-10.) Despite these errors, McKey was issued a "completion notice" for the Action Plan on July 8, 2016. (Emmons Decl. Ex. 22.) It stated: "If consistent performance is not demonstrated, further action, up to and

including termination may result without additional warnings." (Emmons Decl. Ex. 22.) McKey understood that she could be terminated for further performance issues; however, Mehsikomer told McKey not to worry about termination. (McKey Dep. 201:1-203:25.)

In early August 2016, McKey was responsible for handling a corporate action notice about a customer asset called "Iberdrola." (McKey Dep. 205:8-206:2; 212:17-15; Mehsikomer Dep. 101:5-102:22.) After being alerted by the customer that an error had been made in the election, McKey immediately reported it to Mehsikomer and they had a meeting with Frolicher, who told McKey that as the senior employee in the department, she should not be making such mistakes.[3] (McKey Dep. 95:3-96:12, Frohlicher Dep. 64:10-19.) Mehsikomer asked McKey to check if other accounts were affected by the same issue. (McKey Dep. 213:16-218:23, 221:7-225:12; Mehsikomer Dep. 102:13-105:9; Emmons Decl. Ex. 14.) Ultimately, the department discovered that the Iberdrola asset election was processed incorrectly due to an issue with XSP. (McKey Dep. 206:6-209:11; *see also* Emmons Decl. Ex. 27.) But after Mehsikomer directed McKey to look at the same issue in other accounts, McKey gave Mehsikomer incorrect calculations and failed to produce information for two other accounts that were affected by the same error. (McKey Dep. 214:25-216:23; Mehsikomer Dep. 102:13-105:9; Emmons Decl. Exs. 14, 25.) And throughout the first half of August, errors continued. For example, on August 15, 2016,

_____

[3] The error resulted in a $62,000 loss. (McKey Dep. 208:7-21, 209:12-210:9.)

Mehsikomer emailed McKey asking her to correct an error she had made processing a notification. (Emmons Decl. Ex. 23; McKey Dep. 227:5-228:15.) On August 17, 2016, McKey made another error posting an event. (Emmons Decl. Exs. 14, 24; McKey Dep. 228:17-229:5.)

## V.     McKey's Termination

Finally, on August 18, 2016, Mehsikomer recommended terminating McKey to Frohlicher and Owens. (Emmons Decl. Ex. 25; Mehsikomer Dep. 98:3-20; Frohlicher Dep. 11:5-16; Owens Dep. 9:25-10:15.) Mehsikomer detailed the reasons for her recommendation, including: the 60-day Action Plan, failure to perform due diligence after Iberdrola, and additional errors using XSP. (Emmons Decl. Ex. 25.) Owens responded that she was informing her manager, Joers, and said she wanted to consult with Guse as well. (Owens Dep. 17:11-18:25; Joers Dep. 12:2-8; Ex. 26.) Upon discovering that the Iberdrola error was an XSP issue rather than a McKey error, Mehsikomer emailed Guse on August 30, 2016:

> [n]ew information came to light regarding an error we thought [McKey] created which caused a large loss. Someone from XSP, which is our Corp Action system, informed us of a more accurate way to execute this process. Due to this new info, she may have done it the way she was told to. Since it's impossible to tell, we cannot hold her accountable for it, however, there are other errors. I am not sure if they warrant termination, but at this point I am not clear how to proceed. I hold firm to the fact that Julie cannot keep up with the demands of her desk so something needs to be done.

(Emmons Decl. Ex. 27.)

Previously, on August 19, 2016, Guse emailed Alice Owens, Keith Frohlicher, and Mehsikomer, suggesting that instead of immediately terminating McKey, U.S. Bank give her 30 days to find a new role at U.S. Bank or externally. (Emmons Decl. Ex. 27.) On September 13, 2016, McKey met with Mehsikomer, Guse, and Frohlicher. (McKey Dep. 230:5-233:24.) They told McKey that due to her additional errors, she had 30 days to secure a job, and that if she could not find a job within 30 days, she would no longer be employed at U.S. Bank. (McKey Dep. 230:5-234:25, 253:3-254:4.)

## VI. McKey's Job Search within U.S. Bank

McKey applied for seven positions at U.S. Bank but was not interviewed for any.[4] (McKey Dep. 248:13-249:14; Ex. 32; Guse Dep. 30(b)(6) 11:17-22.) McKey had one screening phone call with a U.S. Bank recruiter, but it was not regarding a current open position. (McKey Dep. 254:10-255:24.) Ultimately, McKey left U.S. Bank's employment on October 13, 2016. (McKey Dep. 253:3-7; Mehsikomer Dep. 149:5-17; Ex. 35.)

In September 2017, McKey brought suit against U.S. Bank for age discrimination and retaliation in violation of the MHRA. On November 8, 2017, U.S. Bank timely removed the case to this Court. McKey claims that U.S. Bank treated her differently, terminated her, and refused to hire her into another position due to her age. McKey also

---

[4] McKey asserts that she applied for nine different positions with U.S. Bank. [*See* ECF No. 76 ("Pl. Mem. in Opp'n") at 16 n.4.]

claims that U.S. Bank retaliated against her by terminating her and refusing to hire her into another position after she reported age discrimination.

## ANALYSIS

### I.     Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could . . . return a verdict for [the non-movant]." *Baucom v. Holiday Co.*, 428 F.3d 764, 766 (8th Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

In considering a motion for summary judgment, the court must resolve factual disputes in favor of the nonmoving party. *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987). To avoid summary judgment, the nonmovant must present enough facts "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient;" rather, "there must be evidence on which the jury could reasonably find for the Plaintiff." *Anderson*, 477 U.S. at 252. Put another way, the nonmoving party cannot create a genuine dispute of fact by relying upon conclusory allegations, speculation or general assertions, but must produce sufficient probative evidence in the record demonstrating a genuine issue for trial. *See id.* at 256; *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009); *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

## II.     McKey's MHRA claims

The MHRA prohibits an employer from "discharg[ing] an employee" or "discriminat[ing] against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of age. Minn. Stat. § 363A.08, subd. 2(2) & (3).

### A.     Age discrimination: Decision to terminate

Where, as here, the plaintiff does not have direct evidence of discrimination, the Court applies the *McDonnell Douglas* burden-shifting analysis to MHRA claims. *Chambers v. Metropolitan Property & Cas. Ins. Co.*, 351 F.3d 848, 855 (8th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Friend v. Gopher Co.*, 771 N.W.2d 33,

37–40 (Minn. Ct. App. 2009). Under this well-established framework, McKey must first establish a prima facie case of age discrimination. *Chambers*, 351 F.3d at 855. To do so, she must meet her burden of production demonstrating that: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she was discharged; and (4) age was a factor in the employer's decision to terminate her. *Id.*; *Grant v. City of Blytheville, Arkansas*, 841 F.3d 767, 773 (8th Cir. 2016). Replacement by a younger person is ordinarily sufficient circumstantial evidence to demonstrate that age was a factor in termination. *Chambers*, 351 F.3d at 855-56. If McKey succeeds in her prima facie case, the burden of production shifts to U.S. Bank to articulate a legitimate, nondiscriminatory reason for its conduct. *Id.* at 856. And if U.S. Bank offers such a reason, to avoid summary judgment, McKey must then demonstrate that the proffered reason is pretext for unlawful discrimination. *Id*.

### 1. Prima facie case

McKey alleges a prima facie case of age discrimination by indirect proof: she was a member of the protected class; she was qualified to perform her duties as a Securities Specialist, but fired despite that fact; and she was replaced by employees that were approximately thirty years younger, leading to an inference of discrimination. U.S. Bank does not argue with the first and third elements of McKey's prima facie case—that she is a member of a protected class and that she was discharged. The second and fourth factors require the Court's analysis.

As to the second element, U.S. Bank argues that McKey was not qualified for the position she held. In support of this argument, U.S. Bank proffers the case of *Richmond v. Bd. of Regents of Univ. of Minnesota*, 957 F.2d 595, 598 (8th Cir. 1992). In *Richmond*, "defendants produced abundant documentation, covering approximately eighteen months, that [plaintiff's] performance was unsatisfactory, that she ignored progressive warnings and discipline, and that her performance did not improve." *Id.* While the record contains abundant documentation of McKey's performance issues, it also contains proof that McKey completed her Action Plan. McKey argues that a reasonable factfinder could find that she was qualified for the Securities Specialist position based upon her years of service and her performance reviews. While this case presents a factual circumstance similar to that described in *Richmond*, when the Court evaluates the evidence in the light most favorable to McKey, it concludes that McKey met the minimum qualifications for her job. Correspondingly, then, McKey has met her burden under the second step of *McDonnell Douglas*.

McKey argues that she meets the fourth element of her prima facie case because she was, she asserts, replaced by younger individuals. U.S. Bank disagrees, asserting that it never hired a permanent replacement for McKey's position, but that her duties were disseminated throughout the Global Corporate Actions team. (*See* Mehsikomer Dep. 160:24-161:1; Owens 30(b)(6) Dep. 14:14-15:3.) McKey's proffered evidence includes that after she was terminated three individuals (ages 25, 27, and 33) were hired to the team

(though not for her position). The evidence in the record indicates that U.S. Bank has not hired a permanent replacement for McKey, which leads to the conclusion that McKey has not met the fourth element of her prima facie case. *See Nash v. Optomec, Inc.*, 849 F.3d 780, 784 (8th Cir. 2017) (affirming summary judgment where district court determined that temporary assignment of departing employee's workload among team members did not meet the fourth element of the prima facie case). Without more, McKey has failed to establish that age was a motivating factor in U.S. Bank's decision to terminate her employment, and thus she has failed to establish a prima facie case of age discrimination, thus requiring summary judgment for U.S. Bank.

### 2. Pretext

Even if the Court were to determine that McKey established a prima facie case, summary judgment would still be appropriate. U.S. Bank has met its burden to provide a legitimate, nondiscriminatory reason for its termination of McKey—namely, McKey's poor performance, as outlined in her Action Plan, and her continued errors after the Action Plan was completed. Poor performance is of course a legitimate, non-pretexual reason for adverse employment action. *See, e.g., Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028–29 (8th Cir. 2004); *Ramlet v. E.F. Johnson Co.*, 464 F. Supp. 2d 854, 862 (D. Minn. 2006), aff'd, 507 F.3d 1149 (8th Cir. 2007).

The next step in the analysis is pretext, which "merges with the ultimate burden of persuading the court that [the employee] has been the victim of intentional

discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). McKey can demonstrate pretext by showing that U.S. Bank's explanation for its termination is unworthy of credence because it is without basis in fact, or by persuading the court that discrimination is the more likely motivating factor behind her termination. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011); *see also Aase v. Wapiti Meadows Community Technologies & Services*, 832 N.W.2d 852, 859 (Minn. Ct. App. 2013). "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Torgerson*, 643 F.3d at 1047. Showing pretext requires more substantial evidence than the evidence required to make a prima facie case because evidence of pretext is viewed in light of the employer's justification. *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001).

McKey has parsed her arguments into seven. She argues pretext by seeking to establish that: (1) U.S. Bank's proffered reason has no basis in fact; (2) U.S. Bank shifted its explanation for termination; (3) McKey has a long history of good performance and received a favorable review before being fired; (4) younger, similarly-situated employees were treated more favorably; (5) U.S. Bank deviated from its own policies; (6) Mehsikomer had a preference for younger workers, and (7) McKey's managers made ageist remarks. [ECF No. 76 ("Pl. Mem. in Opp'n") at 21.] Each of these arguments fails to establish a genuine issue of material fact precluding summary judgment.

First, U.S. Bank's non-discriminatory explanation for terminating McKey is firmly rooted in the record. McKey had a long history of well-documented performance issues, including making errors on the job both before and after her Action Plan. McKey admitted to struggling with the XSP/SWIFT technology and took longer to complete tasks than other employees in her team. McKey argues that one of her coworkers, Nathan Caswell, believed her general performance was good and was not aware of anything leading up to her termination that would be an issue. (Caswell Dep. 16:20-17:7, 15:20-21.) But there is nothing in the record suggesting that Caswell would have been party to management discussions or meetings about McKey's performance.

Second, McKey argues that U.S. Bank has shifted its explanation for termination. Indeed, substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext. *Kobrin v. Univ. of Minnesota*, 34 F.3d 698, 703 (8th Cir. 1994); *see also Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1028 (8th Cir. 1994). But McKey's argument finds no support in the record. U.S. Bank has maintained a consistent reason for McKey's termination—her well-documented poor performance. (*See e.g.* Emmons Decl. Ex. 14.)

Third, McKey argues that she has a long history of good performance and received a favorable review before being fired. Again, the record belies this description. The Court has discussed McKey's poor performance leading up to her Action Plan and subsequent termination at length. McKey fails to show pretext on this basis.

Fourth, McKey argues that younger, similarly-situated employees who made errors were treated more favorably than her. Comparator evidence may be used to prove pretext, but the test for determining whether an employee is similarly situated to a plaintiff is "a rigorous one." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 955 (8th Cir. 2012.) McKey must show that she and the employees outside of her protected group were similarly situated in all relevant respects. *Id.* at 956. The employees must have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Hervey v. Cnty of Koochiching*, 527 F.3d 711, 720 (8th Cir. 2008) (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)). McKey has the burden to demonstrate that employees outside her protected class were not disciplined as she was for comparable conduct. *See e.g. Doucette v. Morrison Cty.*, 763 F.3d 978, 983 (8th Cir. 2014).

McKey alleges that a number of employees received comparatively less-favorable performance reviews yet were not terminated. The record establishes that these employees either voluntarily resigned, had dissimilar job duties or positions, or were terminated as well. [ECF No. 117 "Reply Br." at 8-9.] None of these employees is a proper comparator.

McKey also alleges that several employees were given lesser discipline for conduct that was more significant than hers.[5] These employees are also not proper comparators because their circumstances (including job duties and employment issues) were all different from McKey's performance issues. These employees are not proper comparators, and the discipline they experienced does not show pretext.

Fifth, McKey argues that with her termination, U.S. Bank deviated from its policies and practices for terminating employees. McKey appears to be arguing that Mehsikomer should have issued her a written warning or moved her to another team prior to recommending that she be terminated. (Pl. Mem. in Opp'n at 37.) McKey cites to no policy requiring progressive discipline, and U.S. Bank employees are at-will. (*See* Mehsikomer 164:5-6.) Additionally, McKey understood that she was an at-will employee and that her employment depended on her maintaining certain standards as laid out in her Action Plan. McKey fails to show pretext on this basis.

Sixth, McKey argues that Mehsikomer generally prefers younger workers because she hired and promoted younger employees. The record does not show such a preference: two college recruits were promoted from junior roles as part of their college recruit program, and Mehsikomer hired another employee, age 57, in the summer of 2016. *See*

---

[5] *See* Rochel Decl. Ex. NN (warning for causing $34,000 loss); LL (warning for multiple processing errors); Exs. CC-DD (warning); Ex. GG at USB001206 (warning); Ex. II (warning); Ex. Z at USB001234 & USB001240 (warning); Ex. JJ at USB001528-29 ("write up"); Ex. KK (warning for harassment).

*Noreen v. Pharmerica Corp.*, 118 F. Supp. 3d 1130, 1141 (D. Minn. 2015) ("Without knowing, for example, whether [employer] passed up older applicants in favor of younger ones—save for [plaintiff], . . . —It is impossible to draw any inference of age discrimination simply from the ages of the persons hired."). McKey fails to show pretext on this basis.

Seventh, McKey alleges that Mehsikomer made ageist comments. Specifically, McKey asserts that Mehsikomer's statement that "I want to point out that she has been here longer than any of us and she is going to people who have been here just over a year. This goes to show that Julie is in over her head and cannot keep up with the direction Corp Actions is headed." (Emmons Decl. Ex. 27.) At best, Mehsikomer's statement is a stray comment, not evidence of discrimination. The comment also refers not to age, but to tenure with the company, and length of tenure, although it may correlate empirically with age, is not synonymous with age. *Erickson v. Farmland Indus.*, 271 F.3d 718, 725 (8th Cir. 2001). Thus, the Court cannot find pretext on this basis either.

### 3.    Conclusion

All in all, even assuming that McKey has presented enough evidence to make out a prima facie case of age discrimination, she has not demonstrated that U.S. Bank's proffered termination rationale is mere pretext. *See e.g., Stuart v. General Motors Corp.*, 217 F.3d 621, 635–36 (8th Cir. 2000) (finding that proof possibly sufficient to establish a prima facie case was insufficient to establish pretext). Summary judgment on McKey's age discrimination claim is therefore required.

## B.    Age discrimination: Failure-to-hire

The elements for McKey's termination and failure-to-hire claims are the same as her age discrimination claim, the only difference being the nature of the adverse action (termination versus failure-to-hire). *See Chambers*, 351 F.3d at 856; *see also Tusing v. Des Moines Independent Community School District*, 639 F.3d 507, 515 (8th Cir. 2011) (listing elements of age discrimination based on a failure to hire). With respect to McKey's failure-to-hire claim, U.S. Bank only argues lack of pretext. It is undisputed that McKey did not make it to the interview phase for any of the positions to which she applied. (Guse 30(b)(6) Dep. 20:1-8.)

In attempting to demonstrate pretext, McKey argues that Mehsikomer and Guse did not assist her in trying to find jobs, informed the recruiters and hiring managers that she was a poor performer, and caused her applications to be rejected. (Pl. Mem. in Opp'n at 46-47.) In support of this argument, McKey cites to three places in the record. First, Guse's 30(b)(6) deposition: "well, we were transparent in saying, you know, 'She wasn't meeting expectations of the current, role but here are the strengths that she has.' So it's common practice to provide well-balanced feedback, I would say, through any transition, because we want to make sure that it's ultimately a good fit at the end of it." (Guse 30(b)(6) Dep. 29:9-30:7.) Next, Guse's individual deposition testimony: "That was my intent, was to try to knock down any barriers, such as being overqualified, appearing – whether it was true or not, appearing to be overqualified for those roles." (Guse Dep.

103:1-10.)[6] Finally, an email exchange between Mehsikomer and Tammy Stockay: "I know that [McKey] just applied for your open position. Did you get a chance to talk to Jane about interviewing her?" to which Stockay responded, "I did speak briefly with Jane. Is there a reason why she is looking to change to a position at a lower grade than she currently is?" (Rochel Decl. Ex. SS.) Mehsikomer replied, "[McKey] is just keeping her options open." (*Id.*)

None of these interactions demonstrates pretext. None of the managers against whom McKey alleges discrimination (Mehsikomer, Frohlicher, Owens, and Joers) was responsible for interviewing or hiring for the seven positions to which she applied. (*See* Emmons Decl. Ex. 33 (listing hiring managers); McKey 161:1-18.) And the record clearly shows that instead of discriminating against her, both Mehsikomer and Guse tried to help McKey with her resumé and the application process. (Emmons Decl. Ex. 14; Guse Dep.

---

[6] McKey fails to include Guse's response to a prior question that clarifies her answer, above, which was:

> I offered my assistance to Julie throughout the 30-day time frame, in terms of happy to review your resumé and provide feedback. I'm happy to – if you want to let me know what reqs you are – jobs you are applying to, if you let me know what those are, I'm happy to reach out to those recruiters to ensure that you are minimally considered for those positions. Julie expressed concern to me that some of the positions she was applying to were a grade level below her current grade level and that she was nervous – she would not be looked at because she would – she would be viewed as over qualified and not even considered.

(Guse Dep. 101:11-103:10 (external quotations omitted)).

101:11-103:10.) McKey has not met her burden of showing pretext on her failure-to-hire

discrimination claim, and summary judgment on this claim is therefore required.

### C.      Reprisal/Retaliation under the MHRA

McKey's remaining claim is that U.S. Bank engaged in a course of retaliation and

reprisal against her by terminating her and failing to hire her after she complained about

possible age discrimination. The elements of a prima facie reprisal claim are: (1) McKey

engaged in statutorily protected activity; (2) she was subjected to an adverse employment

action; and (3) a causal connection existed between the two. *Bahr v. Capella Univ.*, 788

N.W.2d 76, 81 (Minn. 2010). The elements of a retaliation claim are the same. *See Evans v.

Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 100 (8th Cir. 1998).

The parties dispute and address only causation. "The causal connection prong

may be satisfied by evidence of circumstances that justify an inference of retaliatory

motive, such as a showing that the employer has actual or imputed knowledge of the

protected activity and the adverse employment action follows closely in time." *Freeman

v. Ace Tel. Ass'n*, 404 F. Supp. 2d 1127, 1141 (D. Minn. 2005), *aff'd sub nom. Freeman v. Ace

Tel. Ass'n.*, 467 F.3d 695 (8th Cir. 2006) (citing *Dietrich v. Canadian Pacific Ltd.*, 536 N.W.2d

319, 327 (Minn. 1995) (citation omitted) (analyzing reprisal claim under the MHRA)). The

relevant question before the Court is, therefore, is whether the record supports an

inference that by terminating McKey or failing to re-hire her, U.S. Bank was retaliating

against McKey for raising the issue of age discrimination.

U.S. Bank argues that there is no evidence that Mehsikomer, Frohlicher, or Owens even had knowledge of McKey's age discrimination allegation while she was still employed with U.S. Bank, which is fatal to McKey's termination retaliation claim. McKey responds that Guse had knowledge of McKey's report, was key to McKey's termination, and that a reasonable factfinder could find that Guse told Mehsikomer of McKey's report.

McKey engages in significant speculation when interpreting the record before the Court on the issue of causation. As noted by U.S. Bank and established in the record: "Guse testified she never told Mehsikomer about the report, McKey testified she never told Mehsikomer about the report, and Mehsikomer testified that she could not recall when she learned about the report but that it was not while McKey was employed at U.S. Bank." (Reply Br. at 13-14 (citing McKey Dep. 189:4-15; Mehsikomer Dep. 64:19-65:8, 69:1-10; Guse Dep. 36:2-8.)) McKey reported age discrimination after being placed on the Action Plan, and nearly four months before her termination.

Other than McKey's speculation that Guse was a bad actor who disclosed McKey's age discrimination claim to Mehsikomer, McKey is left with temporal proximity to support her retaliation claim. "The temporal proximity must be very close: a period of more than two months between protected activity and adverse employment action is generally too long to support causation without additional evidence." *Naguib v. Trimark Hotel Corp.*, No. 15-CV-3966 (JNE/SER), 2017 WL 598760, at *7 (D. Minn. Feb. 14, 2017), *aff'd*, 903 F.3d 806 (8th Cir. 2018) (internal quotations omitted). Here, four months lapsed

between McKey's report and the termination and failure to be re-hired. Without additional evidence, this time frame is too long to support causation. See *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) ("[O]nly in cases where the temporary proximity is very close can the plaintiff rest on it exclusively."); *Freeman*, 404 F. Supp. 2d at 1142 (holding plaintiff had established temporal proximity but failed to produce additional evidence). The record is devoid of any evidence linking McKey's alleged report of age discrimination with either her termination or the failure to hire. Summary judgment on McKey's retaliation claim is therefore required.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment [ECF No. 49] is GRANTED; and

2. This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 12, 2019                              BY THE COURT:


                                                  s/Nancy E. Brasel
                                                  Nancy E. Brasel
                                                  United States District Judge